[Cite as *State v. Prater*, 2018-Ohio-932.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-374 |
| v. | : | (C.P.C. No. 16CR-927) |
| Frederick A. Prater, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 13, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *Wolfe Law Group, LLC*, and *Stephen T. Wolfe* for appellant.

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Frederick A. Prater, Jr., appeals a judgment of the Franklin County Court of Common Pleas entered on April 25, 2017, sentencing him to serve 23 years in prison for three counts of felonious assault, three gun specifications, and one count of weapon under disability. Because his convictions were sufficiently supported by the evidence introduced and not against the manifest weight of the evidence, because it was not necessary to merge any of the counts, and because any potential error in admitting an unclear video of the events was harmless, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 19, 2016, a Franklin County Grand Jury indicted Prater for four counts of felonious assault with gun specifications and one count of possessing a weapon while under disability. (Feb. 19, 2016 Indictment.) Prater pled not guilty and the case was tried before a jury (except for the weapon under disability count which was tried to the

court). (Feb. 26, 2017 Plea Form; Tr. Vols. 1-3, filed June 19, 2017.)  During trial, eight witnesses testified: three men at whom Prater fired a revolver (Juan Mullins, Lewis Pettey, and Darius White), a female bystander whom Prater shot (Stephanie Norvett), an officer who responded to the scene, the detective who investigated the case, and a detective and forensic analyst who obtained and edited a video which may show the shooting.

{¶ 3}    The first witness who testified was the responding officer.  He recounted that on May 11, 2015 at around 10:50 p.m. he was called to a scene near the intersection of South Champion and McAllister Avenues. (Tr. Vol. 1 at 52.)  He found one victim near the intersection, Norvett, with a bullet wound in her abdomen. *Id.* at 53-54.  The police eventually located three men whom they believed to have been the targets of the shooting and who gave the police a description of the shooter. *Id.* at 58-59, 66.  The description was of a tall thin black man with braids or dreadlocks. *Id.* at 66.

{¶ 4}    At trial these three men at whom Prater allegedly shot, Mullins, Pettey, and White, testified that they were in the vicinity of 1117 McAllister Ave. on May 11, 2015. (Tr. Vol. 1 at 68, 74; Tr. Vol. 2 at 215-17, 269-70.)  While Mullins, Pettey, and White were at the scene of the eventual shooting, a different trio (two men and one woman) who were evidently having car trouble appeared and asked to borrow a phone. (Tr. Vol. 1 at 69; Tr. Vol. 2 at 216, 270.)  Pettey agreed to lend them his phone. *Id.*  After a period of time, White or Pettey or both, asked the man seated in the passenger seat of the car to return the phone. (Tr. Vol. 1 at 70-71; Tr. Vol. 2 at 217-18, 272.)  The man responded that they could have it back when he was done. *Id.*  Around the time of this exchange, Pettey noticed that the man in the front passenger seat had a gun, a revolver. (Tr. Vol. 2 at 244-45.)  White or Pettey or both told the man in the passenger seat that he could just keep the phone (which was apparently a free telephone distributed as part of a government program). (Tr. Vol. 1 at 71; Tr. Vol. 2 at 217-18, 272.)  Mullins, Pettey, and White began to walk away when the man who had been sitting in the passenger seat got out of the car and lobbed the phone after them. (Tr. Vol. 1 at 71; Tr. Vol. 2 at 220, 272.)  It broke when it struck the ground and Pettey or White or both made a remark to the effect of, "Touchdown, he scored!" (Tr. Vol. 1 at 71-72; Tr. Vol. 2 at 220, 272.)

{¶ 5}    Immediately after the remark, all three men heard at least one gunshot and started running away. (Tr. Vol. 1 at 71-72; Tr. Vol. 2 at 220, 272-73.)  Mullins reported that

he heard approximately six gunshots. (Tr. Vol. 1 at 77, 79.) Pettey recounted that he heard two gunshots. (Tr. Vol. 2 at 220, 265.) White said he heard one shot. *Id.* at 283. Pettey said he saw the person (who was formerly seated in the front passenger seat) standing by the passenger side door. *Id.* at 222-23, 226, 247, 265. Pettey testified that this man was the same person who threw the phone and, after the "Touchdown" remark, produced a gun and shot. *Id.* Pettey saw the first shot but only heard the second shot because after the first shot he ran. *Id.* at 265. White saw the passenger assume what he considered to be an angled shooting position and then heard a shot. *Id.* at 282-83. But White admitted it was very dark and he could not see clearly. *Id.* Mullins and White noticed that Norvett had been struck by a bullet as they escaped the scene but could not risk stopping to render aid. (Tr. Vol. 1 at 80; Tr. Vol. 2 at 273, 300.) After escaping from the immediate scene, Pettey asked two female bystanders to telephone the police. (Tr. Vol. 2 at 227-29.)

{¶ 6} An enhanced video taken from a nearby Central Ohio Transit Authority camera was shown to Pettey, White, and Mullins with the result that all identified it as appearing to generally depict the scene and the incidents in question. (Tr. Vol. 1 at 89-91; Tr. Vol. 2 at 234, 239, 288.) But none of those three could testify definitively about what the video (which is extremely dark and blurry) shows. (State's Ex. J.; Tr. Vol. 1 at 89-91; Tr. Vol. 2 at 234-39, 288-90.) None of the three men identified Prater as the passenger. (Tr. Vol. 1 at 76; Tr. Vol. 2 at 231-32, 302, 304-05.) All three men described the passenger as black with short dreadlocks. (Tr. Vol. 1 at 97; Tr. Vol. 2 at 219, 274, 287.)

{¶ 7} The person who was struck by the bullet, Norvett, also testified. Norvett testified that she knew two of the people in the car, Prater and the other male companion,[1] and had known them since childhood. (Tr. Vol. 2 at 141-43, 181.) She testified that she saw them both on May 11, 2015 but that her memories of that evening were somewhat erratic. *Id.* at 143, 157. She admitted that she had smoked some marijuana and had drunk some Hennessy cognac that evening. *Id.* at 182-83. She testified that she did not witness any of the altercation involving the cell phone. *Id.* at 146-49. As she remembered it, Prater and his two companions were in a car and needed a jump-start. *Id.* at 145. She had walked

---

[1] Prater's companion was tried for the same offenses in the same trial as Prater and acquitted by the jury, and our discussion of him is thus limited.

across the street to see if she could find some help when she was shot. *Id.* at 145-46. She testified that she did not know who shot her. *Id.* She only heard one shot. *Id.* at 195.

{¶ 8} Norvett admitted that initially, at the hospital, she identified Prater as the one who shot her. *Id.* at 159-60. She admitted that she picked Prater from a photo lineup and wrote on the associated identification form that, "he pulled the gun out and shot." (State's Ex. C1; Tr. Vol. 2 at 161-64.) However, at trial, she insisted that she had been confused and on medication and that she did not actually know who shot her. (Tr. Vol. 2 at 160.) She admitted that she signed an affidavit approximately ten months after the shooting in which she swore that Pater was not the shooter. *Id.* at 167, 192-93, 206. She had denied having told the prosecutor that she signed the affidavit because she was scared, but she did confess that she told the prosecutor she was frightened for her children. *Id.* at 167-68. She stated that Prater never threatened her and that she made the affidavit of her own free will. *Id.* at 200. However, she admitted that she spoke to Prater's family between her original interview with the police detective and signing the affidavit ten months later. *Id.* at 206-07. Norvett confirmed that she spoke to Prater on the telephone while she was still in the hospital and said he denied having shot her. *Id.* at 164-65. She confirmed that she changed hospital rooms after that phone call, but testified that the change was not because she was nervous about Prater knowing what room she was in. *Id.* at 165-66. Although she insisted at trial that she did not know who shot her, she admitted she could not definitively say that it was not Prater and she confirmed that Prater had been seated on the passenger side of the car. *Id.* at 156, 168-69, 175-76, 179.

{¶ 9} The investigating detective testified that he interviewed Norvett at Grant Medical Center approximately four days after the shooting. (Tr. Vol. 3 at 409, 414.) Although he did not review her records or obtain a list of the medications she was on, and although he admitted she must have been in pain and on some medications, he maintained that Norvett had not appeared to be conspicuously under the influence of medication at the time of the interview. *Id.* at 409-10, 418-19. The detective testified that Norvett identified Prater by name as the person who shot her, picked him out of a photographic lineup administered by a "blind" administrator, and wrote on the identification form that Prater "pulled the gun out and shot." *Id.* at 410-13; State's Ex. C1. The detective admitted, however, that he also interviewed Norvett in September 2016 and, at that time, Norvett

opined that Prater's companion in the driver's seat of the car was the one who shot her. (Tr. Vol. 3 at 421-22.)  The detective also explained that he obtained video of the scene from the Central Ohio Transit Authority, whose nearby building cameras had recorded what took place.  *Id.* at 407-08.  He testified that he took that raw footage to a unit of the Ohio Attorney General to see if it could be digitally clarified.  *Id.*

{¶ 10}  An expert forensic analyst from the Ohio Organized Crime Investigation Commission testified that, at the request of the police, he clarified, brightened, and magnified the video to enable its contents to be more easily observed. (Tr. Vol. 3 at 372-73, 377-78.)  He explained that, other than a red box, which he drew around potentially relevant portions of the video, he did not alter the substance of the video.  *Id.* at 377-78.  He agreed that flashes of light seen on the video are consistent with gunshots but could also have been caused by any number of other things.  *Id.* at 381, 388-90.

{¶ 11}  The crime scene search detective documented the location of the Central Ohio Transit Authority camera from which video was taken and enhanced. (Tr. Vol. 2 at 335-36; State's Exs. P40-42.)  He also testified (and the State's exhibits confirmed) that two .45-caliber shell casings were recovered near the driver's side of the car and seven 9mm shell casings were recovered, one from near the passenger side of the car, and the rest from against the curb across the street (on the driver's side of the car). (Tr. Vol. 2 at 343-45; State's Exs. E3, P3, P10-11, P17-24.)  Additional exhibits and the detective's testimony to identify them were offered to establish that the police recovered pieces of an LG cellular telephone near the intersection of McAllister and South Champion Avenues. (Tr. Vol. 2 at 331-35, 343; State's Exs. P25-P26, P28, P32, P34-36.)

{¶ 12}  On March 24, 2017, the jury found Prater guilty of felonious assault with gun specifications concerning shots fired at Norvett, White, and Pettey, one specification for each. (Mar. 24 2017 Verdict Forms, filed Mar. 29, 2017.)

{¶ 13}  One month later, on April 25, 2017, the trial court held a hearing. (Sentencing Tr., filed June 19, 2017.)  Based on the evidence at trial and a stipulation to a prior disabling conviction, the trial court found Prater guilty of possessing a weapon while under disability for a previous felony conviction.  *Id.* at 3.  It then sentenced Prater as follows: one year on the weapon while under disability conviction, seven years plus a three-year firearm specification for the felonious assault on Norvett, and five years plus three-year firearm

specifications for each of the other two felonious assaults for shots fired at White and Pettey. *Id.* at 12-13. Based in part on Prater's stated and considerable criminal history, the trial court required Prater to serve the sentences for the three felonious assault counts consecutively to each other and consecutively to two of the firearm specifications, for a total of 23 years. *Id.* at 13-14; Apr. 25, 2017 Jgmt. Entry at 2. The remaining sentences (for one of the firearm specifications and the weapon under disability offense) were imposed concurrently with the other sentences. (Sentencing Tr. at 13-14; Apr. 25, 2017 Jgmt. Entry at 2.)

{¶ 14} Prater now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Prater assigns five assignments of error for our review:

> [1.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE INTRODUCTION OF AN UNAUTHENTICATED VIDEO INTO EVIDENCE
>
> [2.] THE EVIDENCE PRESENTED AT TRIAL WAS INSUFFICIENT TO SUPPORT THE CONVICTIONS
>
> [3.] THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR ACQUITTAL PURSUANT TO CRIMINAL RULE 29
>
> [4.] THE JURY'S VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
>
> [5.] THE FELONIOUS ASSAULTS WERE ALLIED OFFENSES OF SIMILAR IMPORT THAT SHOULD HAVE MERGED FOR PURPOSES OF SENTENCING

## III. DISCUSSION

### A. Second, Third, and Fourth Assignments of Error – Whether the Verdicts were Against the Manifest Weight of the Evidence, Whether They were Supported by Sufficient Evidence, and Whether a Criminal Rule 29 Motion for Acquittal Should have been Granted

{¶ 16} In his second assignment of error, Prater alleges that his convictions were not supported by sufficient evidence. Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy.

> Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 17} Although Prater's third assignment of error challenges the denial of his motion for acquittal, this does not necessitate a separate review because "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995); *Thompkins* at 386.

{¶ 18} Prater's fourth assignment of error challenges the manifest weight of the evidence. The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley* at ¶ 10, quoting *Thompkins* at paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * *. Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 19} The Ohio Revised Code defines the offense of felonious assault in relevant part as follows:

> (A)  No person shall knowingly do either of the following:
>
> * * *
>
> (2)      Cause or attempt to cause physical harm to another * * *
> by means of a deadly weapon * * *.

R.C. 2903.11(A)(1) and (2).  Physical harm to another "means any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).  A deadly weapon is "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2923.11(A).

{¶ 20} There seems to be no dispute in the briefs that felonious assault is the crime at issue concerning Norvett, White, and Pettey.  A gun is a deadly weapon and intentionally shooting at someone with one is an attempt to cause physical harm.  Rather than contest these points, Prater's argument is essentially that no one consistently or convincingly identified him as the shooter and that, even if he was the shooter, testimony that fewer than three bullets were fired means he could not have been guilty of three counts of felonious assault. (Prater Brief at 12-14.)

{¶ 21} Based on Prater's identity argument there is also only a narrow dispute as to the weapon under disability offense. *See* R.C. 2923.13.  That is, Prater stipulated to a disqualifying prior conviction at trial. (Sentencing Tr. at 3.)  On appeal, he also does not dispute that, if it were he who shot at Norvett, White, and Pettey, it was proper that the trial court found him guilty of "hav[ing], carry[ing], or us[ing] any firearm" while under disability. R.C. 2923.13(A).

{¶ 22} On the identity issue, the evidence was inconsistent as between Norvett, White, and Pettey, but there was evidence identifying Prater as the shooter.  Norvett identified Prater as the shooter in her initial interview with the police and in writing when she selected him from a photographic lineup. (Tr. Vol. 2 at 161-64; State's Ex. C1.)  Though she subsequently recanted (signing an affidavit stating that Prater was not the shooter), at

the time of trial she maintained that she just did not know who had shot her. (Tr. Vol. 2 at 160-64, 168-69, 192-93.)  Though she denied having been frightened into changing her story, she admitted that she feared for her children and that she had spoken with Prater's family between the shooting and the trial. *Id.* at 167-68, 206-07.  Furthermore, though Norvett proved unwilling or unable to ultimately testify that Prater shot her, she never recanted her testimony that Prater was the man seated in the passenger side of the stranded vehicle before the shooting. *Id.* at 156, 168-69, 175-76, 179. White and Pettey testified that the passenger fired at them and that Norvett was hit in the shooting. *Id.* at 265, 282-83; Tr. Vol. 1 at 80; Tr. Vol. 2 at 273, 300.  While White and Pettey could not directly identify Prater as the shooter, the jury could find that their testimony, in conjunction with Norvett's, effectively identifies Prater.

{¶ 23} "[V]iewing the evidence in a light most favorable to the prosecution, a[] rational trier of fact could have found the essential element" of identity to have been "proven beyond a reasonable doubt." *Monroe* at ¶ 47.  As for the manifest weight question, although evidence exists from which the jury could have reached a different conclusion about whether Prater was the shooter, we cannot say that the evidence is so against conviction that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶ 24} The evidence was also mixed on the question of how many shots were fired. Mullins reported that he heard approximately six gunshots. (Tr. Vol. 1 at 77, 79.)  Pettey recounted that he heard two gunshots. (Tr. Vol. 2 at 220, 265.)  White said he heard one shot. *Id.* at 283.  Norvett only heard one shot. *Id.* at 195.  The crime scene search detective recovered nine shell casings from the scene, fired from two different guns. (Tr. Vol. 2 at 343-45; State's Exs. E3, P3, P10-11, P17-24.)  But Pettey testified that the gun the passenger had was a revolver (which would not have automatically ejected spent shell casings) and some of the casings were crushed or dented when recovered. (Tr. Vol. 2 at 244-45; State's Exs. P19-20.)  The jury heard testimony that it is possible that the casings recovered at the scene have nothing to with the crime at issue in this appeal. (Tr. Vol. 2 at 353-59.)

{¶ 25} Given the mixed state of the evidence about how many shots were fired, we do not conclude that the evidence was insufficient or manifestly against any of Prater's felonious assault convictions.  "[V]iewing the evidence in a light most favorable to the

prosecution, a[] rational trier of fact could have found" that Prater shot multiple times. *Monroe* at ¶ 47. Nor is it against the manifest weight of the evidence that Prater shot multiple times such that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387.

{¶ 26} Even if only one shot had been fired in Norvett's direction and that of the fleeing men, such evidence is not necessarily incompatible with multiple felonious assault convictions. Several courts have upheld multiple felonious assault convictions where the evidence established that a single shot was fired by a defendant toward multiple victims in the line of fire. *State v. Massalay*, 10th Dist. No. 15AP-544, 2016-Ohio-779, ¶ 34-38; *see also State v. Mills*, 62 Ohio St.3d 357, 369 (1992); *State v. Gowdy*, 6th Dist. No. E-06-071, 2009-Ohio-385, ¶ 23-27; *State v. Neal*, 2d Dist. No. 82 CA 82, 1984 WL 5433, 1984 Ohio App. LEXIS 8876, *41-42 (Jan. 20, 1984); *see also, e.g.*, *State v. Jones*, 18 Ohio St.3d 116 (1985) (holding that a person who drives recklessly and kills more than one person in a single collision may be properly convicted of a separate count of aggravated vehicular homicide for each death). However many shots the jury may have found that Prater fired, there was evidence to indicate that he knowingly fired a gun at Norvett, White, and Pettey. That constitutes felonious assault with gun specification as to each of them and suffices (in conjunction with his stipulated prior conviction) to show that he carried and used a firearm while under disability.

{¶ 27} Prater's second, third, and fourth assignments of error are overruled.

### B. First Assignment of Error – Whether the Trial Court Erred in Admitting the Video Evidence at Trial

{¶ 28} Generally, a decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 11-22. Prater argues that the Central Ohio Transit Authority video, as enhanced by the forensic analyst, should not have been permitted into evidence by the trial court because it was not authenticated and not an original version under Ohio Rules of Evidence 901 and 1002. (Prater Brief at 7-11.)

{¶ 29} Ohio Rule of Evidence 901 requires that evidence be authentic. To introduce an exhibit for which authenticity is disputed, the proponent must produce "evidence sufficient to support a finding that the matter in question is what its proponent claims."

Evid.R. 901(A). One method of authentication is through testimony of a witness with knowledge that the matter is what it is claimed to be. Evid.R. 901(B)(1). In this case, the witnesses to the shooting all testified that the video appeared to depict the scene on the night in question. (Tr. Vol. 1 at 89-91; Tr. Vol. 2 at 174, 234-39, 288-90.) Though none of the shooting witnesses could be very definite about the particulars of what the extremely dark and blurry video showed, none of them testified that the video was anything other than what it was offered to represent. (State's Ex. J.; Tr. Vol. 1 at 89-91; Tr. Vol. 2 at 176-77, 234-39, 288-90.) In addition, the State established a chain of custody of the video shown, eliminating inference of spoliation or tampering such as could affect its reliability. The investigating detective testified that he obtained video of the area where the shooting took place that had been recorded by the Central Ohio Transit Authority's building cameras. (Tr. Vol. 3 at 407-08.) The detective also testified that he took this raw video footage to a unit of the Ohio Attorney General for digital clarification. The analyst from the Ohio Attorney General's office who performed the digital enhancement identified the video and testified about his work on it. (Tr. Vol. 3 at 372-73, 377-78.) The trial court did not abuse its discretion in concluding that the video was sufficiently authenticated.

{¶ 30} Ohio Rule of Evidence 1002 requires that when seeking to prove the contents "of a writing, recording, or photograph, the *original* writing, recording, or photograph is required," except as otherwise provided by law. (Emphasis added.) Evid.R. 1002. Here an original version of the video that had been enhanced was offered into evidence and not the original, unaltered video.

{¶ 31} The Ohio Rules of Evidence define a duplicate item of evidence as:

> [A] counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduce the original.

Evid.R. 1001(4). A duplicate version of the video would have been admissible to the same extent as the original unless a genuine question were raised about the authenticity of the original or unless circumstances would have made it unfair to admit the duplicate in lieu of the original. Evid.R. 1003. The problem here is that no exact duplicate of the original video

as taken from Central Ohio Transit Authority's camera was tendered in discovery or presented at trial, only an enhanced version of it.  Neither party disputes this fact.

{¶ 32} At least one Ohio court has permitted enhanced recordings into evidence despite not specifically being an exact "duplicate" under the rule. *State v. Burnett*, 3d Dist. No. 15-86-20, 1987 WL 20300, 1987 Ohio App. LEXIS 9701 (Nov. 24, 1987).  But in *Burnett*, the original version also was admitted. *Id.* at * 7.  Other courts have not admitted duplicates where the duplicate was an altered version and the original was not produced. *Shaw Publications v. Adams & Sons Well Drilling*, 5th Dist. No. 2003CA00271, 2004-Ohio-4117, ¶ 11; *State v. Brown*, 108 Ohio App.3d 489, 496-97 (8th Dist.1995).

{¶ 33} At trial, Prater's counsel objected to the admission of the video on the grounds that it had been admittedly edited and yet the original, or even an exact copy of the original, was not provided in discovery. (Tr. Vol. 3 at 431.)  Instead, Prater's attorney asserted and filings on the docket show, that although the defense requested broad discovery of items listed in Ohio Rule of Criminal Procedure 16(B)(1), the prosecution only turned over videos that were edited by a unit of the Ohio Attorney General's office, the Organized Crime Investigations Commission. *Id.*; Mar. 8, 2016 Discovery Req.; Dec. 27, 2016 Supp. Discovery; Mar. 17, 2017 Supp. Discovery.  Specifically, two edited videos were provided (one which was shown at trial and one which was not). (Tr. Vol. 3 at 431.)  But the original or even an unedited copy of the original, was never provided or played. *Id.*

{¶ 34} While the trial court's justification for admitting only an edited original video was that the defense had "power of subpoena," we need not determine whether it abused its discretion by doing so.  (Tr. Vol. 3 at 432.)  We have reviewed the transcript in this case and the video.  The witnesses differed among each other about many aspects of the events of May 11, 2016, but all were unified in their observation that it was difficult to ascertain substantially any specific details from this video, even as enhanced. (State's Ex. J.; Tr. Vol. 1 at 89-91; Tr. Vol. 2 at 175-79, 234-39, 288-90; Tr. Vol. 3 at 381, 388-91.)  Our own review of the recording confirms that it is dark, extremely grainy, and other than showing a white car, a street, and a couple of indistinct figures flitting across the screen, it is essentially unintelligible as evidence. (State's Ex. J.)  Since we have already concluded that the trial court did not abuse its discretion in determining that the video was sufficiently authenticated, we cannot say that an original video that is unenhanced would be of any

better quality or affect the result of this trial. Even if it was an abuse of discretion to have admitted the altered copy, the error was harmless beyond a reasonable doubt.[2] *See State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987); *State v. Rahman*, 23 Ohio St.3d 146, 150 (1986); Crim.R. 52(A).

{¶ 35} Prater's first assignment of error is overruled.

### C. Fifth Assignment of Error – Whether the Trial Court Erred in Failing to Merge the Felonious Assault Counts

{¶ 36} The determination of whether offenses are allied offenses of similar import is reviewed de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 26-28. The Ohio statute on allied offenses provides that:

> (A) Where the same conduct by [the] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25.

{¶ 37} The Supreme Court requires that R.C. 2941.25 be interpreted and applied by evaluating three separate factors—the conduct, the animus, and the import of the offenses involved. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph one of the syllabus. While an indictment may set forth counts separately for a single act, the key analysis under the statute is whether the courses of conduct underlying the counts are dissimilar enough to constitute separate crimes. Two or more offenses that are of dissimilar import exist under division (B) of R.C. 2941.25 "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and

---

[2] We express no opinion on the issue of whether withholding the original video (if that video was "favorable" to the defense), might have impacted Prater's substantial rights. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The question of whether there was prejudice in failing to introduce the video "in its original, unenhanced (for clarity) form" is not specifically before us and nothing in the record indicates that an original, unaltered version still exists.

identifiable." *Ruff* at paragraph two of the syllabus. And, under division (B) of R.C. 2941.25, a defendant may be convicted of multiple offenses when any one of the following is true: "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Ruff* at paragraph three of the syllabus.

{¶ 38} The evidence admitted at trial did not require merger. The felonious assaults Prater was convicted of involved different victims (Norvett, Pettey, and White) and different harms to Norvett (who was actually shot) as compared to Pettey and White (who were only shot at). *Id.* at paragraph two of the syllabus. Only one of the two factors, "separate victims" or "separate and identifiable" harm is required to create "dissimilar import." *Id.* at paragraph two of the syllabus. And "dissimilar import" is but one of the three circumstances in which "a defendant whose conduct supports multiple offenses may be convicted of all the offenses." *Id.* at paragraph three of the syllabus. The State provided evidence to satisfy *Ruff.* The trial court was not required to merge any of the felonious assault convictions.

{¶ 39} Prater's fifth assignment of error is overruled.

## IV.   CONCLUSION

{¶ 40} Prater's convictions were not against the manifest weight of the evidence or insufficiently supported. Any error by the trial court in admitting the unclear video of the scene was harmless. The three felonious assault counts concerned three different victims and different harms among them and did not necessitate merger. We overrule all five of Prater's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and HORTON, JJ., concur.