[Cite as *State v. Thompson*, 2025-Ohio-2168.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-40 |
| | : | |
| v. | : | Trial Court Case No. 24CR0192 |
| | : | |
| LAURENCE THOMPSON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | **FINAL JUDGMENT ENTRY & OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 20, 2025, the judgment of the trial court is affirmed in part, reversed in part, and remanded for proper imposition of jail-time credit.

Costs to be paid as follows: 75% to the Appellant and 25% to the Appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


[[Applied Signature]]
_____
MICHAEL L. TUCKER, JUDGE


[[Applied Signature 2]]
_____
RONALD C. LEWIS, JUDGE

[[Applied Signature 3]]

_____

MARY K. HUFFMAN, JUDGE

**OPINION**

CLARK C.A. No. 2024-CA-40

JENNIFER E. MARIETTA, Attorney for Appellant
ROBERT C. LOGSDON, Attorney for Appellee

LEWIS, J.

**{¶ 1}** Defendant-Appellant Laurence Thompson appeals from his convictions in the Clark County Common Pleas Court following a jury trial. For the following reasons, the judgment of the trial court will be affirmed in part and reversed in part, and the cause will be remanded for resentencing.

## I.   Procedural History and Facts

**{¶ 2}** On February 21, 2023, Thompson was indicted by a Clark County grand jury in Clark C.P. No. 23-CR-99 on two counts of felonious assault, in violation of R.C. 2903.11(A)(2), felonies of the first degree (Counts I and II); one count of discharge of a firearm at or near prohibited premises, in violation of R.C. 2923.162(A)(3), a felony of the third degree (Count III); and one count of having weapons while under disability, in violation of R.C. 2923.13(A)(1), a felony of the third degree (Count IV). The felonious assault counts included specifications that the victim of the offense was a peace officer acting in the performance of his/her official duties and three-year firearm specifications. Count III also included a three-year firearm specification.

**{¶ 3}** On March 12, 2024, Thompson was re-indicted by a Clark County grand jury in Clark C.P. No. 24-CR-192 on a superseding indictment for the same four counts charged in Case No. 23-CR-99, with the addition of seven-year firearm specifications on Counts I and II alleging that Thompson discharged a firearm at a peace officer while committing the offense.

**{¶ 4}** A jury trial was held on June 25, 2024, at which the following testimony and evidence were presented. Springfield Police Officer Greg Ivory, a 22-year veteran, testified that on August 10, 2022, he worked the midnight shift and was assigned to uniform patrol. His partner that night was Officer Amanda Rosales. Rosales was driving their marked patrol car, and both officers were wearing their police uniforms. The officers were dispatched to 1818 Lagonda Avenue in reference to a black male who was wearing black clothing in the front yard and had a handgun. The officers were only about eight blocks away from the address and arrived shortly thereafter. The officers did not activate their lights and sirens to prevent alerting the suspect that they were coming.

**{¶ 5}** Due to how the house at 1818 Lagonda Avenue was situated, Rosales drove by the house and stopped a little past it on the south side of the street. Ivory got out of the cruiser with his service weapon and a flashlight. Ivory started around the back side of the cruiser heading toward the house on the north side of the street when shots rang out from the direction of the house. Ivory heard three shots fired in rapid succession from next to the house. Ivory stated that he was familiar with the sound and feel of gunfire due to his experience at the gun range and having been shot at before. In response to the gun fire, Ivory fired two rounds in the direction from which the shots had come. Ivory's service firearm was a .40 caliber pistol, and the two casings from the bullets he fired were eventually recovered in the street on Lagonda Avenue. Because the area from which the shots had

been fired was not illuminated, Ivory did not see who fired the rounds at him and Rosales.

{¶ 6} Ivory and Rosales went to the passenger side of their car for cover and advised dispatch that shots had been fired. The officers saw a concrete block building, which they believed would provide better protection, so they moved behind the building. Shortly thereafter, Ivory advised over the radio that he observed two males running along the fence toward the railroad tracks, which was to the west of 1818 Lagonda Avenue, and Rosales advised that a car was leaving the area behind 1818 Lagonda Avenue.

{¶ 7} After additional officers arrived, Ivory and three other officers walked across the street to clear the side yard of the Lagonda Avenue address. When they cleared the yard, they did not observe any suspects in the area.

{¶ 8} Officer Rosales testified that she had been with the Springfield Police Division for five years. On August 10, 2022, Rosales and her partner, Officer Ivory, were dispatched to 1818 Lagonda Avenue in reference to a male and unwanted guest being at the residence with a firearm. As the driver that night, Rosales parked the police cruiser on the south side of Lagonda Avenue facing eastbound, which was across the street from 1818 Lagonda Avenue. She had driven just a little east of 1818 Lagonda Avenue before stopping. Both officers got out of the cruiser and headed toward the back of the car. As they started to cross the street, gunfire erupted. Rosales saw the muzzle flash coming from the direction of the walkway or ramp area of 1818 Lagonda Avenue, which was on the east side of the house. Officer Ivory stepped in front of Officer Rosales to block her from the gunfire while he returned fire. The officers retreated to a building behind them for better coverage.

{¶ 9} While taking cover behind the building, Rosales saw the headlights of a vehicle turn on at the rear of 1818 Lagonda Avenue. The vehicle was in an alley and headed east toward Jimmy T's bar. The vehicle then backed up and turned on to Henry Street, where it

was stopped by other Springfield officers.

{¶ 10} Springfield Police Detective Kevin Miller testified that on August 10, 2022, he responded to 1818 Lagonda Avenue for an officer-involved-shooting. When he arrived on the scene, Miller received a brief rundown of the events and walked through the area. The front door and porch of 1818 Lagonda Avenue were located on the east side of the house. The porch had a separate exterior door and was entirely enclosed. A sidewalk progressed along the east side of the house running north and south up to the east-side porch door. A wheelchair ramp ran from the porch door down toward the rear of the house and into the backyard, where the sidewalk continued around the back of the house. An alley ran east-west behind the house. To the east was Henry Street and to the west was Cohen Recycling Center and the train tracks.

{¶ 11} Miller spoke with Scott Newbold, who had called 911 at 12:27 a.m., and Javah Moxey, both of whom resided at the 1818 Lagonda residence. Miller later reviewed the dispatch logs, which showed that the shots-fired communication was received at 12:29 a.m. According to Miller, Newbold indicated that a man had come to his front door with a gun and "racked" it, causing an unfired bullet to fall to the ground. A .40 caliber round was discovered near the front door inside the porch area. Newbold described the person who pulled the gun as a black male with dreads. He further informed Miller that two females, later identified as Myla Simmons and Aliyah Kelly, had come over essentially as escorts. Newbold had sent Simmons money through Cash App a few hours before the shooting on August 9, 2022, after she had texted him the cost of an Uber from Dayton to 1818 Lagonda Avenue. It was later determined that Simmons and Kelly did not use Uber to get to 1818 Lagonda Avenue on August 10, 2022. Newbold admitted he had a gun with a flashlight attachment, which he turned over to the police.

{¶ 12} Moxey told Miller that he had gone to Certified gas station prior to the shooting and believed people were following him. The police report indicated that Moxey identified three black males as the people following him: a heavyset male with short hair; a tall, thin male with short hair; and a tall, thin male with short dread-style hair. Moxey stated they were all wearing black clothing.

{¶ 13} A .40 caliber spent shell casing was recovered from the backyard of 1818 Lagonda Avenue. The shell casing was located just behind the rear of the house and a few feet to the west of the walkway. Miller explained that when a semi-automatic firearm is fired, the slide would push back, and the extractor would pull out the spent cartridge casing and eject it. A new round from the magazine would then go up into the chamber and be ready to cycle the weapon again if the trigger were pulled. Although shell casings can bounce and move around once ejected, generally, a shell casing would eject over the shoulder, back and to the right or directly to the right.

{¶ 14} Miller collected surveillance video from the Certified gas station located at 1350 North Belmont Avenue. On the video, around 12:02 a.m. on August 10, 2022, Moxey could be seen inside the gas station using the ATM for approximately two minutes before leaving the store.

{¶ 15} Miller also collected surveillance video from the Cohen Recycling Center located just to the west of 1818 Lagonda Avenue on the same side of the street. In the video, which was introduced at trial, Officer Rosales's police car could be seen driving eastbound toward 1818 Lagonda Avenue. In the minute after the officers' arrival, some light distortions were visible in the windows of a house, and then a shadow, which appeared to be a person, ran past the fence line by the Cohen Recycling Center, away from 1818 Lagonda Avenue. Miller testified that another person, possibly two, appeared to have run

in the same direction shortly thereafter.

{¶ 16} When Miller later reviewed the reports of other officers, he researched the license plate of the vehicle that had been leaving the scene and stopped on August 10, 2022. Simmons and Kelly were identified as the two occupants of the vehicle. An empty holster was observed inside the vehicle, but it was not collected. Miller determined that the vehicle was owned by James Stokes, and he researched Stokes's known associates. A new technology called Flock had recently become available that would track and photograph vehicles identified by their license plate through various cities in Ohio. Miller learned through Flock that the vehicle in question had been in Dayton prior to the shooting and returned to Republic Drive in Dayton around 3 a.m. on August 10, 2022. Simmons's address was near Republic Drive.

{¶ 17} On September 15, 2022, Miller met with Simmons and was able to develop Thompson as a suspect. Miller was never able to make contact with Kelly. Miller learned that Thompson was in the Warren County jail. Miller also learned that Thompson had been arrested in Huber Heights, Ohio, and a .40 caliber firearm had been recovered from his car. Miller was interested in the firearm because of the .40 caliber shell casing that had been recovered from the rear of 1818 Lagonda Avenue on the night of the shooting. Both the shell casing and the firearm were sent for testing to confirm whether Thompson's firearm was the one used to fire the recovered shell casing.

{¶ 18} On September 28, 2022, Miller met with Thompson for a recorded interview, which was introduced into evidence. During the interview, Thompson initially denied that he had ever been to Springfield, Ohio, or that he knew Myla Simmons or Aliyah Kelly. When questioned about the gun he had in his possession when he was arrested in Huber Heights, he claimed that he had picked it up off the ground in the Northland apartment complex on

September 1.

{¶ 19} Thompson eventually admitted that, on the night of the shooting, he had been sleeping in the car that went to Springfield and did not know he was in Springfield until he woke up. Thompson stated that he was trying to get a ride home that night and did not know they were going to Springfield. He testified that Simmons and Kelly had been in the car with him, along with two other males known to him as "Black" and "Joe." They were in "Black's" car. Thompson believed everyone had a gun that night.

{¶ 20} Thompson claimed that when the car stopped, he got out and started walking to the gas station but realized it was too far away, so he went back to the car. The car was parked behind the house in the alley. While in the car, he got a text message from Kelly claiming that she was being held inside a room in the house. Thompson was concerned that the guys were going to rape her, so he went up to the door to tell the women to get out of the house. Thompson stated he was the only one to go up to the door.

{¶ 21} Thompson asserted that he had the gun that night that "was supposedly fired at the officer." He later confirmed during the interview that the gun he had at the door was the same gun found in his car during the subsequent traffic stop in Huber Heights. Thompson initially claimed he found the gun on the ground outside and picked it up, but he later admitted that it was in the car and he got it out of the holster before going up to the door. Thompson asserted that he went to the door without the magazine in the gun. When asked about the live round that was found on the ground on the porch in front of the door, Thompson claimed he dropped the magazine that he kept in his pocket, and it may have fallen out. He stated that he probably put the magazine in the gun as he was leaving because the guy at the house had pulled a gun on him.

{¶ 22} Thompson stated that when "shit hit the fan," he did not know that there was

an officer present; he thought it was the "old boy" who had a gun with a light on it. Thompson denied shooting at the officers or that he fired any gun that night. According to Thompson, when he left the front door, he put the gun back in the car just before he heard shots. He then took off running toward the railroad tracks. Simmons eventually found him and picked him up. Everyone else he had been with that night was in the car when he got picked up.

{¶ 23} At the time of the shooting, Thompson had a warrant out for his arrest from Warren County, Ohio.

{¶ 24} Huber Heights Police Officer Joseph Sanchez testified that, while he was working midnight patrol on September 3, 2022, he conducted a traffic stop on Thompson in Huber Heights. Thompson was the driver and sole occupant of the vehicle, other than a dog. As a result of the traffic stop, Sanchez collected a loaded .40 caliber silver and black Smith & Wesson firearm from under the driver's seat of the vehicle. There was no evidence that other people had recently been in the vehicle.

{¶ 25} Sergeant Doug Pergram of the Springfield Police Division was a supervisor of the property room and crime scene unit on August 10, 2022. Pergram testified that he responded to 1818 Lagonda Avenue on the night of the shooting to process the crime scene. He took photographs and collected evidence, including a spent bullet recovered in the street on Lagonda Avenue, two fired .40 caliber Smith & Wesson cartridge casings recovered in the street on Lagonda Avenue, a ball cap, a .40 caliber live cartridge inside the porch at 1818 Lagonda Avenue, and a fired .40 caliber Smith & Wesson cartridge casing recovered from the rear of 1818 Lagonda Avenue. (Detective Miller had testified that the ball cap was sent for DNA analysis but did not produce any usable DNA.) Pergram identified the .40 caliber casing recovered from the rear of 1818 Lagonda Avenue as a Remington Peters

brand, whereas the .40 caliber live cartridge recovered inside the porch was a Sellier & Bellot brand. In addition to items collected at the scene, Pergram photographed Officer Ivory's police-issued SIG Sauer P226 .40 caliber semiautomatic pistol and Newbold's 9-millimeter Glock handgun with an attached flashlight.

{¶ 26} Daniel Steiner, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified as a firearm expert. His job was to examine and compare firearms to fired ammunition components, such as fired cartridge casings and fired bullets, to determine whether they were fired from a particular firearm. Steiner testified that, in his expert opinion, the .40 caliber silver and black Smith & Wesson recovered from Thompson during the Huber Heights traffic stop was the firearm that fired the .40 caliber shell casing recovered in the back yard of 1818 Lagonda Avenue. According to Steiner, the individual characteristics used to match the shell casing to the .40 caliber silver and black Smith & Wesson were like a fingerprint, and it would have been "moot" to compare that shell casing to any other firearm. The other two .40 caliber fired shell casings recovered from the street in front of 1818 Lagonda Avenue were determined to have been fired from the same firearm, but not from the .40 caliber silver and black Smith & Wesson recovered from Thompson. The gun recovered from Thompson was deemed operable. Steiner was unable to conclusively determine whether the fired bullet recovered from the street in front of 1818 Lagonda Avenue had been fired from the .40 caliber silver and black Smith & Wesson. Steiner's report reflected that the fired bullet had similar class characteristics to that gun but insufficient corresponding individual characteristics to identify or exclude it as having been fired from the .40 caliber silver and black Smith & Wesson.

{¶ 27} The jury found Thompson guilty as charged. On July 10, 2024, the trial court sentenced Thomspon as follows: to an indefinite prison term of 11 to 16½ years for each of

the felonious assaults,[1] with a mandatory consecutive term of 7 years in prison for the peace officer firearm specification; to a definite term of 3 years in prison for discharging a firearm on or near prohibited premises, plus a mandatory consecutive term of 3 years for the firearm specification; and to a definite prison term of 3 years for having weapons while under disability. The court ordered all the prison terms to run consecutively, for an aggregate prison term of 45 years to 50½ years.

{¶ 28} Thompson timely appealed and now raises five assignments of error.

## II. First Assignment of Error

{¶ 29} Thompson's first assignment of error states:

The Court improperly overruled the *Batson* Challenge when the State exercised a peremptory to strike the only prospective juror of color.

{¶ 30} According to Thompson, the prosecution excused prospective juror #5 because of her race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Thompson contends that the trial court erred by overruling his *Batson* challenge to the State's peremptory strike. We do not agree.

{¶ 31} "The Equal Protection Clause of the Fourteenth Amendment strictly prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges." *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001). "When a defendant objects to a prosecutor's peremptory challenge of a prospective juror on these grounds, the trial court must apply a three-step analysis." *State v. Stalder*, 2023-Ohio-2359, ¶ 2. "First, the opponent of the strike must make a prima facie showing of discrimination. Second, the

---

[1] We note that, pursuant to the Reagan Tokes Act, the trial court erred in including in its judgment entry separate maximum prison terms for each sentence imposed. R.C. 2929.144(B)(2); *State v. Blankenship*, 2023-Ohio-4442, ¶ 36 (2d Dist.). However, neither party has raised this issue, and it did not affect the aggregate sentence.

proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination." *State v. White*, 85 Ohio St.3d 433, 436 (1999), citing *Batson* at 96-98, *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995), and *State v. Hernandez*, 63 Ohio St.3d 577, 582 (1992).

{¶ 32} "To make a prima facie case of purposeful discrimination, the defendant must demonstrate (1) that members of a cognizable racial group were peremptorily challenged, and (2) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." *State v. Johnson*, 88 Ohio St.3d 95, 116 (2000), citing *State v. Hill*, 73 Ohio St.3d 433, 444-445 (1995). "The trial court should consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present." *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 98 (1997). "In establishing a prima facie case of purposeful discrimination, defendants may also present statistical evidence about the prosecutor's use of peremptory challenges, side-by-side comparisons of prospective jurors who were struck from the jury and of those who were not, any misrepresentations of the record by the prosecutor when defending the peremptory challenges, and historical evidence of the state's use of peremptory challenges in past cases." *Stalder* at ¶ 17, citing *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019).

{¶ 33} "If the defendant makes a prima facie case of discrimination, the state must then provide a race-neutral explanation." *Johnson* at 116, citing *Hill* at 445. "Although it is not enough to simply deny a discriminatory motive or assert good faith . . . the 'explanation

need not rise to the level justifying exercise of a challenge for cause.' " *State v. Thompson*, 2014-Ohio-4751, ¶ 51, quoting *Batson* at 97, 98. In fact, "the 'second step of this process does not demand an explanation that is persuasive, or even plausible.' " *State v. Gowdy*, 88 Ohio St.3d 387, 392 (2000), quoting *Purkett* at 768. " 'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Purkett* at 768, quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

{¶ 34} Finally, in the third step, "the trial court must determine 'whether the defendant has carried his burden of proving purposeful discrimination.' " *State v. Carver*, 2008-Ohio-4631, ¶ 50 (2d Dist.), quoting *Batson* at 82. "Although a trial court must make a credibility determination, courts need not make detailed factual findings to comply with *Batson*." *Thompson* at ¶ 63, citing *State v. Frazier*, 2007-Ohio-5048, ¶ 98. Rather, "the trial court may express its opinion of the state's race-neutral justification in the form of a clear rejection of the *Batson* challenge, without offering detailed findings, ' "[a]s long as [the] trial judge affords the parties a reasonable opportunity to make their respective records." ' " *State v. Adams*, 2015-Ohio-3954, ¶ 160, quoting *Frazier* at ¶ 98, quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir. 2006). "A trial court's findin[g] of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous." *Johnson* at 116, citing *Hill* at 445.

{¶ 35} Following voir dire of prospective juror #5, the State used a preemptory strike on her, and the defense raised a *Batson* challenge. The trial court stated for the record that prospective juror #5 appeared to be African-American and that she was the only African-American in the panel at that time. Defense counsel noted that there was another African-American prospective juror "in the back" but did not identify how close that individual was to the panel. Defense counsel then stated that the State was using a peremptory strike on

the only African-American sitting in the jury panel, which he believed demonstrated a prima facie case of discrimination for purposes of a *Batson* challenge.

{¶ 36} Prior to using a preemptory strike on prospective juror #5, the State had used two preemptory strikes and waived one, and the defense had used three. The court inquired into whether defense counsel had any evidence that the prosecutor had historically attempted to excuse African-American jurors because of their race. Defense counsel did not have any such evidence. The prosecutor, unprompted, provided the following race-neutral response:

> Well, I'm not biased and, beyond that, I don't believe it established a pattern as necessary. But I also did not, as a race neutral reason I didn't like the way she answered my questions to my hypothetical about the puzzle question saying that even if she had the core of it and she wouldn't be able to convict and despite knowing it, and that first answer is I believe that she gave out came on the manner that I didn't I guess see or agree with the, just her responses in general.

Trial Tr. 72.

{¶ 37} Defense counsel countered that prospective juror #5 had been rehabilitated by defense counsel's questioning because she agreed to be fair and impartial and wait until she had heard all of the evidence before making a decision. The trial court overruled Thompson's *Batson* challenge.

{¶ 38} Here, the State offered a race-neutral explanation for using a peremptory strike, and the trial court denied Thompson's challenge. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the

defendant had made a prima facie showing becomes moot." *Hernandez*, 500 U.S. at 359; *accord Murphy*, 91 Ohio St.3d at 528. Therefore, we need not address whether Thompson satisfied the first *Batson* step.

{¶ 39} The State's race-neutral explanation related to a "puzzle question" that addressed the issue of finding a defendant guilty beyond a reasonable doubt. The prosecutor gave an example of a 100-piece puzzle where 10 of the pieces were missing here and there but one could still make out what the puzzle showed. The prosecutor then asked prospective juror #5 what she would do in that situation. Her responses indicated that she would want all the pieces of the puzzle and was not certain she would be able to convict a defendant if she did not have all the pieces, even if the only missing pieces were ones around the outside border of the puzzle. The State argues that prospective juror #5's responses indicated she would have held the State to a higher burden by requiring all the pieces of the puzzle, i.e., proof beyond *all* doubt. This was a race-neutral explanation.

{¶ 40} Although Thompson argued at trial that the State had passed on other jurors with similar responses, Thompson did not identify any other prospective jurors, either at the time of trial or on appeal, who had provided similar responses and were not struck by the State, and the record does not support this contention.

{¶ 41} Thompson further argues on appeal that the trial court focused too much on Thompson's failure to demonstrate a pattern of discrimination and therefore erred in denying his *Batson* challenge. While it is true that a defendant need not demonstrate a pattern of behavior by the prosecutor in order to make a successful *Batson* challenge, the burden of proving intentional racial discrimination is on the defendant. *Stalder*, 2023-Ohio-2359, at ¶ 23 ("There was no proof of a pattern of strikes against male prospective jurors in this case or historically by the prosecutor in other cases, which, while not required, could give rise to

an inference of discrimination."); *Murphy*, 91 Ohio St.3d at 530 (burden of proving intentional racial discrimination is on the opponent of the strike).

**{¶ 42}** The trial court permitted the State and Thompson a reasonable opportunity to make their respective records by allowing Thompson's counsel to respond to the prosecutor's proffered race-neutral explanation for the peremptory strike. The trial court rejected Thompson's *Batson* challenge, stating that the court did not believe the prosecutor was using a peremptory challenge on the juror because of her race in this case and had not seen the prosecutor do so in any other case over which the court had presided with that prosecutor. The trial court's finding with respect to purposeful discrimination "is entitled to deference, since it turns largely 'on evaluation of credibility.' " *White*, 85 Ohio St.3d at 437, quoting *Batson*, 476 U.S. at 98, fn. 21. Based on the record before us, we conclude that the trial court met its obligations under *Batson,* and the trial court's rejection of the *Batson* challenge was not clearly erroneous.

**{¶ 43}** Thompson's first assignment of error is overruled.

### III.    Second and Third Assignments of Error

**{¶ 44}** Thompson's second and third assignments of error state as follows:

There was not sufficient credible evidence to submit Counts I, II, and III to the Jury.

The convictions for Counts I, II, and III are against the manifest weight of the evidence.

**{¶ 45}** In his second assignment of error, Thompson contends that there was insufficient evidence to submit the case to the jury when he made a Crim.R. 29 motion following the conclusion of the State's case, and therefore the trial court erred in denying the motion. In his third assignment of error, Thompson argues that the guilty verdicts on Counts

I, II, and III were against the manifest weight of the evidence. The evidence a court of appeals considers when reviewing a trial court's denial of a Crim.R. 29 motion is limited to the evidence then available to the trial court. *State v. Bailey*, 2017-Ohio-2679, ¶ 17 (2d Dist.), citing *State v. Sheppeard*, 2013-Ohio-812, ¶ 51 (2d Dist.). In this case, no additional evidence was presented following Thompson's Crim.R. 29 motion. Thus, the evidence this court must consider for Thompson's Crim.R. 29 argument and his manifest weight argument is the same. Therefore, we will consider these two assignments of error together.

{¶ 46} Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." "A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37. "When determining a Crim.R. 29 motion, the trial court must consider the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions concerning whether the evidence the state presented, if believed, proves each and every element of the offense charged beyond a reasonable doubt." *State v. Sowry*, 2004-Ohio-399, ¶ 8 (2d Dist.), citing *State v. Bridgeman*, 55 Ohio St.2d 261 (1978). "A Crim.R. 29 motion must be granted when reasonable minds could only conclude that the evidence fails to prove the elements of the offense." *Id.*, citing *State v. Miley*, 114 Ohio App.3d 738 (4th Dist. 1996).

{¶ 47} When considering the legal sufficiency of the evidence, appellate courts do not engage in a determination of witness credibility. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Rather, the relevant inquiry is whether the evidence presented, if believed, was sufficient to support the conviction. *State v. Jones*, 2021-Ohio-3311, ¶ 16, citing *State v. Thompkins*,

78 Ohio St.3d 380, 390 (1997).

{¶ 48} But "even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. This is because sufficiency of the evidence and manifest weight of the evidence are distinct concepts that are " 'both quantitatively and qualitatively different.' " *Id.* at ¶ 10, quoting *Thompkins* at paragraph two of the syllabus. In contrast to a sufficiency analysis, "[w]hen reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley* at ¶ 20. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *State v. Wilson*, 2009-Ohio-525, ¶ 14 (2d Dist.).

{¶ 49} In Counts I and II, Thompson was charged with felonious assault of Officers Ivory and Rosales, respectively, in violation of R.C. 2903.11(A)(2). Because neither officer was physically harmed during the shooting, the State had to establish that Thompson knowingly attempted to cause physical harm to another by means of a deadly weapon and, in this case, that each of the purported victims was a peace officer. Each count also had an attendant seven-year firearm specification alleging that Thompson had a firearm that was used in furtherance of the crime and discharged the firearm at the peace officer. Count III

charged Thompson with discharge of a firearm at or near prohibited premises, in violation of R.C. 2923.162(A)(3), which provides that no person shall discharge a firearm upon or over a public road or highway and, in doing so, create a substantial risk of physical harm to any person. This count carried a three-year firearm specification alleging that Thompson used a firearm to facilitate the offense.

{¶ 50} Thompson argues that his convictions were against the manifest weight of the evidence and based on insufficient evidence because there were no witnesses who identified him as the shooter. While it is true that no witness testified that he or she had personally observed Thompson fire the gun at the officers on August 10, 2022, there was sufficient circumstantial evidence presented to convict him. Direct and circumstantial evidence possess the same probative value. *State v. Treesh*, 90 Ohio St.3d 460, 485 (2001), citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "A conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155 (1988).

{¶ 51} The evidence at trial established that at 12:27 a.m. on August 10, 2022, Newbold called 911 to report that a man with a gun was in his front yard. Newbold later described the individual as a black male with dread-style hair and advised officers that the suspect had racked his gun, ejecting a live round, while at Newbold's front door. A live .40 caliber round was recovered from in front of Newbold's door on the porch. Newbold had a 9mm Glock firearm with a flashlight attachment in his possession, which he turned over to police.

{¶ 52} When Officers Ivory and Rosales responded approximately two minutes after the 911 call, they were in a police cruiser and wearing police uniforms. Ivory got his gun out and turned a flashlight on when he got out of the car due to the nature of the call and it

being dark outside. As the officers started to approach 1818 Lagonda Avenue, and while not yet half-way across the street, Ivory heard three shots fired in rapid succession. Due to his experience and training, Ivory could tell that the shots were fired from the east side yard of 1818 Lagonda Avenue. Rosales also testified that she observed a muzzle flash from that same area. Both officers testified that the shots were fired at them. Ivory's two fired shell casings were found in the street in front of 1818 Lagonda Avenue. A fired bullet was recovered in the street just to the east of where the officers had parked their car. Although the fired bullet was not definitively identified as being shot from the .40 caliber silver and black Smith & Wesson possessed by Thompson, it had similar class characteristics and could not be excluded as having been fired from that gun.

{¶ 53} A .40 caliber shell casing was recovered from the rear of 1818 Lagonda Avenue, just behind the house and to the west of the walkway. The shell casing was found to have been fired by the .40 caliber silver and black Smith & Wesson found under Thompson's driver's seat during a traffic stop on September 3, 2022. Based on Miller's explanation of where a shell casing would eject once a round was fired from a semi-automatic firearm and the location from which Officers Ivory and Rosales perceived the shots to have been fired, a reasonable inference could have been drawn that the gun was pointed at the officers.

{¶ 54} During Thompson's interview, he admitted to being at 1818 Lagonda Avenue on the night of the shooting. Thompson also eventually admitted taking the .40 caliber silver and black Smith & Wesson out of the holster in the car and bringing it with him to Newbold's front door. Thompson admitted during his police interview that the gun he took to the door was the same gun that he later had in Huber Heights. Interview at 3:20:43. Thus, Thompson admitted that on the night of the shooting he had possession of the gun that fired

at least one bullet at the officers, was a shell casing from that gun was recovered in the backyard of 1818 Lagonda Avenue. Thompson claimed he did not put the magazine in the gun while at the front door and that the live round came out when he dropped the magazine, not because he racked the gun. However, Thompson stated that, as he left the house, he "probably I did put the magazine in the gun" because the homeowner (Newbold) pulled a gun on him.

{¶ 55} Notably, Thompson commented during his interview that when "shit hit the fan," he did not know there was an officer there; he thought it was the "old boy" trying to shoot because he had a gun with a light on it. This statement placed Thompson in the yard of 1818 Lagonda Avenue when the officers arrived and in the direct line of sight of Ivory, who was out of the car with his flashlight illuminated. Moreover, Thompson admitted that he was the only one to go up to the front door, where he would have seen that Newbold had a gun with a flashlight on it.

{¶ 56} The jury could have reasonably concluded that Thompson fired the .40 caliber silver and black Smith & Wesson gun at the officers over the roadway from the rear of 1818 Lagonda Avenue, causing the .40 caliber shell casing to be found behind the house and a bullet to be found in the middle of the street near where the police cruiser was parked. Moreover, Ivory and Rosales were very near each other at the time shots were fired, such that a reasonable jury could have inferred that both officers were in the line of fire. *See State v. Mills*, 62 Ohio St.3d 357, 369 (1992) (affirming felonious assault convictions for those who were in the line of fire but vacating a felonious assault conviction for a teller who was not in the line of fire). Although Thompson claimed that he put the gun back into the car and then heard shots fired, a claim which implicated someone else, the jury was free to believe or disbelieve some or all of Thompson's testimony.

{¶ 57} Having reviewed the entire record, we conclude that Thompson's convictions were supported by sufficient evidence. Moreover, we cannot conclude that this is an exceptional circumstance where the evidence weighed heavily against a conviction. Thompson's second and third assignments of error are overruled.

## IV. Fourth Assignment of Error

{¶ 58} Thompson's fourth assignment of error states:

The Court improperly instructed the Jury on the knowledge element of Counts I and II.

{¶ 59} Thompson argues that the trial court erred in giving a jury instruction proposed by the State, which involved the element of acting "knowingly" in Counts I and II. According to Thompson, the instruction provided by the court created "an implied intent without reliance on supporting facts or context" that resulted in misleading the jury.

{¶ 60} At the conclusion of the evidence, the parties discussed the proposed jury instructions with the court. The State proposed a jury instruction that "firing a weapon into an area without knowledge of occupants [sic] sufficient to establish a knowing attempt to cause physical harm for the purpose of felonious assault conviction . . . ."[2] Trial Tr. 367-368. The State argued that the trial court had given a similar instruction in a recent case. Initially, defense counsel objected to the State's proposed instruction. However, following a brief discussion, the court read the jury instruction it had used in the prior case involving the proposed instruction from the State. The court stated as follows:

All right. Well, the instruction I previously gave in the *Jeffers* case was when knowledge of the existence of a particular fact is an element of the

---

[2] Although the prosecutor stated that he had filed a proposed jury instruction, a copy of the proposed instruction is not in the record.

offense, as in felonious assault, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make any inquiry or acts with a conscious purpose to avoid learning a fact.

The firing of a weapon into an area without knowledge of its occupants is sufficient to establish a knowing intent to cause physical harm for the purpose of a felonious assault conviction.

*Id.* at 373.

{¶ 61} When read to defense counsel, counsel stated "How – how you read it from the *Jeffers* case, we're not objecting to." *Id.* at 374.

{¶ 62} After the court instructed the jury on the culpable mental state of knowingly, consistent with the definition given in R.C. 2901.22(B), the court read the proposed instruction to the jurors. At the conclusion of the instructions, Thompson did not object.

{¶ 63} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White,* 2015-Ohio-492, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Where a party requests an instruction in a criminal case, it must be given if it is "correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59 (1969), paragraph one of the syllabus. "When reviewing the trial court's jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." *State v. Fair*, 2011-Ohio-4454, ¶ 65 (2d Dist.), citing *State v. Hambly*, 2010-Ohio-4040, ¶ 13 (2d Dist.).

{¶ 64} Nevertheless, Crim.R. 30(A) provides that "[o]n appeal, a party may not assign

as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." "The failure to object to a jury instruction constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶ 65} Although Thompson initially objected to the State's proposed instruction, when the court read the proposed instruction, the objection was withdrawn, and both parties agreed to the proposed instruction. Thompson has therefore waived all but plain error relative to the proposed instruction.

{¶ 66} Thompson argues that the jury instruction was erroneous "because it create[d] an implied intent without reliance on supporting facts or context." Appellant's Brief p. 18. According to Thompson, the jurors were led to believe that any firing of a weapon in general constituted intent to cause the officers physical harm, when there was insufficient evidence to support that the officers were in the line of fire. As we concluded in Thompson's second assignment of error above, there was sufficient evidence for the jury to find that Thompson knowingly attempted to cause physical harm to each of the officers by discharging his weapon at them. If the jury believed that Thompson was the shooter, which they did, then the evidence reasonably supported that he knowingly fired in the direction of the officers and placed them both in harm's way.

{¶ 67} In *State v. Jeffers*, 2025-Ohio-989 (2d Dist.), this court upheld the same jury instruction given in this case. We stated in *Jeffers* that the instruction provided by the trial

court was a correct statement of law. *Id.* at ¶ 56. Furthermore, the record contains evidence from which reasonable minds could have concluded that Thompson acted knowingly by discharging a firearm toward the officers. According to the State's theory of the case, Thompson knowingly fired his gun toward the officers, believing that Officer Ivory's flashlight was the light on Newbold's gun. Because the jury instruction requested by the State was a correct statement of law, relevant to the case, and supported by the evidence, we cannot conclude that the trial court committed error, plain or otherwise, when giving the jury instruction.

{¶ 68} Thompson's fourth assignment of error is overruled.

### V. Fifth Assignment of Error

{¶ 69} Thompson's fifth assignment of error states:

The Sentence imposed is Contrary to Law.

{¶ 70} Thompson argues that Counts I, II, and III should have merged for purposes of sentencing. Thompson further contends that, at sentencing, after the court had imposed the separate prison terms for each offense, it incorrectly calculated the total amount of prison time imposed. However, Thompson acknowledges that the total amount of prison time stated in the judgment entry was accurate. Finally, Thompson contends that the court erred in imposing consecutive sentences because it was a single transaction and the harm incurred was not so great or unusual that consecutive sentences were necessary.

#### a. Merger

{¶ 71} "We review de novo whether certain offenses should be merged as allied offenses under R.C. 2941.25." *State v. Bailey*, 2022-Ohio-4407, ¶ 6, citing *State v. Williams*, 2012-Ohio-5699, ¶ 1. R.C. 2941.25 codifies the judicial doctrine of merger and provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 72} " 'As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id.*, quoting *Ruff* at ¶ 31. "[T]wo or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. "The defendant bears the burden of establishing that offenses should be merged as allied offenses." *State v. Frazier*, 2021-Ohio-4155, ¶ 20 (2d Dist.), citing *State v. Albertson*, 2021-Ohio-2125, ¶ 95 (2d Dist.).

{¶ 73} According to Thompson, the trial court erred in failing to merge Counts I, II, and III, because all of the offenses arose out of the same conduct and animus. The State

responds that the shots fired over the roadway, which placed Officers Ivory and Rosales in the line of fire, resulted in three separate victims, which prevented merger.

**{¶ 74}** While we agree with Thompson that the felonious assault counts and discharging a firearm on or near a prohibited premises were committed with the same conduct and the same animus, we nevertheless conclude that Thompson's offenses were of dissimilar import or significance and were not subject to merger. We have previously found that similar offenses did not merge because the offenses involved separate victims. *See State v. Coleman*, 2021-Ohio-968, ¶ 28 (2d Dist.) (where defendant fired single shot at a victim at close range in the roadway, offenses of murder and discharge of a firearm on or near a prohibited premises did not merge); *State v. Davison*, 2021-Ohio-728, ¶ 33 (2d Dist.) (listing cases that found "discharging a firearm on or near a prohibited premises does not merge with murder or other offenses because the offenses are of dissimilar import or significance"). Here, the act of firing across the roadway harmed the public at large whereas firing toward Officers Ivory and Rosales put them personally at risk of serious physical harm.

**{¶ 75}** Likewise, the two felonious assault counts did not merge because there were separate, identifiable victims: Ivory and Rosales. Even if only one shot had been fired in the officers' direction, this would not have changed the outcome regarding merger. *See Ruff*, 2015-Ohio-995, at ¶ 23 (discussing that offenses are of dissimilar import when the defendant's conduct "put more than one individual at risk"). As we noted above, Ivory and Rosales were near each other at the time of the shooting and within Thompson's line of fire. "Several courts have upheld multiple felonious assault convictions where the evidence established that a single shot was fired by a defendant toward multiple victims in the line of fire." *State v. Prater*, 2018-Ohio-932, ¶ 26 (10th Dist.) (listing cases).

{¶ 76} In this case, there was evidence to support that Thompson knowingly fired a gun at Ivory and Rosales, and that he fired over a roadway. Because there were three separately identifiable victims, the trial court did not err in refusing to merge any of the offenses.

### b. Maximum Sentence

{¶ 77} Thompson was sentenced to an indefinite prison term of 11 to 16½ years on Counts I and II, the maximum allowable sentence, each with a mandatory consecutive peace officer firearm specification of 7 years in prison, a definite term of 3 years for Count III, plus a mandatory consecutive term of 3 years in prison for the firearm specification, and a definite prison term of 3 years for Count IV. The trial court ordered that each of the sentences and all of the firearm specifications be served consecutively to each other. At the sentencing hearing, the trial court stated that the sentence was "an indefinite prison term *of 28 to 38 and a half years* in prison plus 17 years for the firearm specifications. What that amounts to, then, is an aggregate sentence of 45 to 50 and a half years in prison." (Emphasis added.) Disposition Tr. 17. The judgment entry imposed an indefinite sentence of 28 to 33½ years in prison, plus 17 years for the firearm specifications, for an aggregate sentence of 45 to 50½ years.

{¶ 78} Thompson argues that the trial court misspoke at the sentencing hearing when it stated that the maximum prison term was 38½ years. While Thompson is correct, this error need not be corrected. Ohio does not follow the federal sentencing-package doctrine, which requires the sentencing court "to consider the sanctions imposed on multiple offenses as the components of a single, comprehensive sentencing plan." *State v. Saxon*, 2006-Ohio-1245, ¶ 5. Instead, Ohio courts impose sentences for each separate offense. Ohio sentencing law "makes no provision for grouping offenses together and imposing a single,

'lump' sentence for multiple felonies." *Id.* at ¶ 8. Here, the trial court imposed a sentence for each individual offense. Consequently, the only sentences that matter in this case are the individual ones imposed on each count; the trial court's statement that it imposed an aggregate sentence of 38½ years was superfluous. Notably, the trial court accurately identified the aggregate sentence in the judgment entry: 45 to 50½ years in prison. More importantly, the judgment entry accurately reflected the individual sentences imposed and the aggregate maximum prison sentence imposed. Accordingly, there is no sentencing error that must be corrected.

### c. Consecutive Sentences

{¶ 79} Finally, Thompson argues that the trial court erred in imposing consecutive sentences because the record did not support consecutive sentences under R.C. 2929.14(C)(4)(b). The State responds that the trial court also found that consecutive sentences were appropriate under R.C. 2929.14(C)(4)(a), which negates the need to consider the criteria under R.C. 2929.14(C)(4)(b). The State further states that the record supports a finding under R.C. 2929.14(C)(4)(a).

{¶ 80} In reviewing felony sentences, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 21. Under that statute, an appellate court may increase, reduce, or otherwise modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either: (1) that the record does not support certain specified findings (including those in R.C. 2929.14(C)(4), which concern the imposition of consecutive sentences); or (2) that the sentence imposed is otherwise contrary to law. *Id.* at ¶ 9, citing R.C. 2953.08(G)(2). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required

'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 81} "Ohio law presumes that a defendant convicted of multiple crimes will serve his sentences concurrently." *State v. Glover*, 2024-Ohio-5195, ¶ 38, citing R.C. 2929.41(A). A trial court may, however, impose consecutive sentences when the law specifically permits it to do so, such as the exception provided for in R.C. 2929.14(C)(4). *Id.*, citing R.C. 2929.41(A). Under R.C. 2929.14(C)(4), to impose consecutive sentences, the trial court must find that: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender"; (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public"; and (3) one or more of the following three findings is made:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4)(a)-(c). Only one of the three required findings under R.C. 2929.14(C)(a)-(c) is required to impose consecutive sentences. *State v. Parrish*, 2023-Ohio-2409, ¶ 24 (2d Dist.).

{¶ 82} To impose consecutive sentences, "a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, syllabus. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* at ¶ 29.

{¶ 83} Under R.C. 2953.08(G)(2), "where a trial court properly makes the findings mandated by R.C. 2929.14(C)(4), an appellate court may not reverse the trial court's imposition of consecutive sentences unless it first clearly and convincingly finds that the record does not support the trial court's findings." *State v. Withrow*, 2016-Ohio-2884, ¶ 38 (2d Dist.). This is a deferential standard of review of the trial court's consecutive sentence findings, and it prohibits an appellate court from simply substituting its judgment for that of the trial court. *State v. Gwynne*, 2023-Ohio-3851, ¶ 15.

{¶ 84} At the sentencing hearing, the trial court made the appropriate statements, as well as additional findings under R.C. 2929.14(C)(4)(a) that Thompson had committed the offenses in this case while awaiting trial or sentencing and under R.C. 2929.14(C)(4)(b) that "[a]t least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct."

The trial court's findings were also included in the judgment entry. Thompson contends, however, that the trial court's findings under R.C. 2929.14(C)(4)(b) were not supported by the record. Because we conclude that the record did not clearly and convincingly fail to support the trial court's consecutive sentence findings under R.C. 2929.14(C)(4)(a), we need not consider the trial court's consecutive sentence findings under R.C. 2929.14(C)(4)(b).

{¶ 85} The trial court found that R.C. 2929.14(C)(4)(a) applied in that Thompson committed the underlying offenses in this case while awaiting trial or sentencing in Warren County, Ohio. There was no dispute about this finding. During Thompson's September 28, 2022 interview, he met with detectives at the Warren County Jail and admitted that, at the time of the shooting, he had an active warrant for his arrest from Warren County. There was a brief discussion during the interview that Thompson would not be released from custody because he still had a case pending in Warren County and another case pending in Montgomery County. Because the trial court's consecutive sentence finding under R.C. 2929.14(C)(4)(a) was not clearly and convincingly unsupported by the record, we need not consider whether the record clearly and convincingly does not support the trial court's finding under R.C. 2929.14(C)(4)(b).

{¶ 86} Because the record in this case does not clearly and convincingly fail to support the trial court's consecutive sentence findings under R.C. 2929.14(C)(4)(a), the trial court did not err by imposing consecutive sentences.

{¶ 87} Thompson's fifth assignment of error is overruled.

### VI.  Sixth Assignment of Error

{¶ 88} Thompson's sixth assignment of error states:

Defendant was not properly notified of his jail time credit in accordance with R.C. 2929.19(B)(2)(g)(i).

{¶ 89} Although provided in the judgment entry, Thompson contends that the amount of jail-time credit to which he was entitled was not stated on the record at the sentencing hearing. Because jail-time credit must be given at the time of sentencing and included in the sentencing entry, Thompson asks this court to remand the matter for a new sentencing hearing to impose jail-time credit. The State concedes error in this regard, and we agree that the trial court failed to impose jail-time credit at the sentencing hearing.

{¶ 90} A defendant must be informed of the total number of days of jail-time credit to which he or she is entitled at the time of sentencing, up to and including the sentencing date, and this number must be included in the judgment entry. R.C. 2929.19(B)(2)(g)(i). Where a trial court fails to award jail-time credit at the time of sentencing and a defendant is not given the opportunity to be heard on the issue of jail-time credit, a limited resentencing is appropriate for the trial court to specify the total number of days of jail-time credit to which a defendant is entitled and to allow the defendant an opportunity to be heard on the issue of jail-time credit. *See State v. Dearmond*, 2022-Ohio-3252, ¶ 16 (2d Dist.).

{¶ 91} In this case, it is undisputed that the trial court did not calculate and notify Thompson of the total number of days of jail-time credit he would receive at the sentencing hearing or give him an opportunity to be heard on the issue of jail-time credit. Thompson's sixth assignment of error is sustained.

## VII. Conclusion

{¶ 92} Having sustained Thompson's sixth assignment of error, the judgment of the trial court is reversed in part and remanded for resentencing solely to have the trial court specify the total number of days of jail-time credit to which Thompson was entitled as of the date of his sentencing and to allow him the opportunity to be heard on the issue of jail-time credit. The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.