[Cite as *State v. Barber*, 2025-Ohio-5061.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30342 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 03363 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| SETH DAVID BARBER | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 7, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

EPLEY, P.J., and HUFFMAN, J., concur.

ROBERT ALAN BRENNER, Attorney for Appellant
SARAH H. CHANEY, Attorney for Appellee

HANSEMAN, J.

{¶ 1} This case is before us on the appeal of defendant-appellant, Seth Barber, from his convictions of two counts of rape of a child under the age of ten. Following a jury trial, Barber was found guilty of these offenses, as well as two counts of sexual battery, which were merged into the rape convictions at sentencing. According to Barber, his due process rights were violated because the indictment charged him with multiple identical counts, but the victim testified to only one specific incident. Barber also contends his convictions on one count of rape and one count of sexual battery were based on insufficient evidence. Finally, Barber asserts that the trial court erred in imposing consecutive sentences. Barber failed to object on any of these grounds in the trial court. As a result, plain error analysis applies.

{¶ 2} After reviewing the record and applicable law, we conclude that Barber's due process rights were not violated when the indictment charged him with multiple identical charges of rape and sexual battery. Ohio law permits use of statutory language in charging instruments, and the child victim described multiple incidents of the charged crimes during her forensic interview and at trial. Barber was also informed of the basis of the indictment when the court held a pretrial hearing concerning the admissibility of the victim's forensic interview.

{¶ 3} Furthermore, Barber's sufficiency challenge is based on an alleged contradiction in the victim's testimony. This involves credibility, which does not apply to sufficiency analysis. The State established the elements of the crimes, and the victim

testified to multiple incidents of rape and sexual battery. Consequently, the jury's guilty findings on Barber's second rape and sexual battery offenses were based on sufficient evidence.[1] Finally, the court did not err in imposing consecutive sentences for the two charges of rape of a child under ten years of age. Because no plain error, or even any error, occurred in the trial court, the judgment is affirmed.

## I. Facts and Course of Proceedings

{¶ 4} In January 2024, Barber was indicted with two counts of rape of a child under the age of 10, first-degree felonies, and two counts of sexual battery (parent/child under 13), second-degree felonies. The indictment alleged that the offenses occurred between August 1, 2023, and September 20, 2023, and involved A.B., Barber's seven-year-old daughter. Barber's trial was initially set for June 24, 2024, but in May 2024, the State filed a motion seeking a pretrial ruling concerning the admissibility of A.B.'s forensic interview. The court continued the trial and set a hearing on the matter for July 22, 2024.

{¶ 5} Following the hearing and submission of memoranda from the parties, the court granted the State's motion, concluding that disclosures made at three intervals in the interview impacted medical treatment and mental health counseling for the child. Decision Granting State's Motion for Admission of Forensic Interview, p. 4.

{¶ 6} Barber's jury trial began on November 13, 2024, and upon its conclusion, the jury found Barber guilty of all charges. At the sentencing hearing, the parties agreed that Counts II and IV (sexual battery) merged into Counts I and III (rape), and the State elected

---

[1] Barber's rape and sexual battery offenses were merged by the trial court, so he was convicted of only two counts of rape. *State v. Whitfield*, 2010-Ohio-2, ¶ 12 ("a 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty"). Yet Barber's assignment of error is directed at his convictions of rape *and* sexual battery, to which the State has responded urging affirmance of both "convictions." To facilitate our analysis, we address the parties' arguments as to both charges, understanding they pertain to the sufficiency of the evidence supporting the jury's guilty verdicts.

to have the court sentence Barber on the two rape counts. The count sentenced Barber to 15 years to life on each count and imposed the sentences consecutively for an aggregate sentence of 30 years to life in prison. Barber timely appealed from his convictions.

## II. Adequate Notice of Offenses

{¶ 7} Barber's first assignment of error states:

THE TRIAL COURT DENIED BARBER'S RIGHT TO DUE PROCESS UNDER ARTICLE I, SECTION 16 OF THE CONSTITUTION OF THE STATE OF OHIO AND AMENDMENTS V AND XIV OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA.

{¶ 8} Under this assignment of error, Barber contends that his due process rights were violated because the indictment charged him with multiple identical counts, but A.B. testified to only one specific incident.

{¶ 9} "An individual accused of a felony is entitled to an indictment setting forth the 'nature and cause of the accusation' pursuant to Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the United States Constitution. The purpose of an indictment is twofold. By compelling the government to aver all material facts constituting the essential elements of an offense, an accused is afforded with adequate notice and an opportunity to defend. . . . An indictment, by identifying and defining the offense, also enables an accused to protect himself from any future prosecutions for the same offense." *State v. Sellards*, 17 Ohio St.3d 169, 170 (1985), citing *Redmond v. State*, 35 Ohio St. 81, 82-83 (1878), and *Harris v. State*, 125 Ohio St. 257 (1932). Under Crim.R. 7(B), a statement in an indictment "may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to

4

give the defendant notice of all the elements of the offense with which the defendant is charged."

{¶ 10} "An indictment meets constitutional requirements if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *State v. Childs*, 88 Ohio St.3d 558, 565 (2000), quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974). Defendants who wish for more information are entitled, both by statute and under the Criminal Rules, to request a bill of particulars. *State v. Haynes*, 2022-Ohio-4473, ¶ 19, citing Crim.R. 7(E) and R.C. 2941.07. If a proper request is made, or upon court order, the prosecutor has a mandatory duty to provide a bill of particulars. *Id.* at ¶ 20. "A bill of particulars has a limited purpose—to elucidate or particularize the conduct of the accused alleged to constitute the charged offense." *Sellards* at 171.

{¶ 11} In the case before us, Counts I and III of the indictment charging rape both alleged that between August 1, 2023, and September 20, 2023, Barber "did engage in sexual conduct with another, not the spouse of the offender, and the other person was less than thirteen years of age, to wit: a person less than ten years of age, whether or not the offender knows the age of the person, contrary to the form of the statute (in violation of Section 2097.02(A)(1)(b) of the Ohio Revised Code)."

{¶ 12} Counts II and IV charging sexual battery alleged that between August 1, 2023, and September 20, 2023, Barber "did engage in sexual conduct with another, not the spouse of the offender, said offender being the other person's natural or adoptive parent or a stepparent or guardian, custodian, or person in loco parentis of the other person, and the other person was less than thirteen (13) years of age, contrary to the form of the statute

(in violation of Section 2907.03(A)(5) of the Ohio Revised Code)." All four counts tracked the language of the relevant statutes.

{¶ 13} Barber did not object to the indictment's language, nor did he ask for a bill of particulars. As a result, Barber has forfeited all but plain error, "which requires proof of an obvious error and a reasonable probability that the error was prejudicial." *State v. Perry*, 2025-Ohio-1486, ¶ 42 (2d Dist.), citing *State v. Moore*, 2024-Ohio-6050, ¶ 51 (2d Dist.).

{¶ 14} In arguing that his due process rights were violated, Barber relies on *Valentine v. Konteh*, 395 F.3d 626 (6th Cir. 2005). In *Valentine*, a habeas action challenging the defendant's convictions under Ohio law, the Sixth Circuit Court of Appeals found that an indictment charging the defendant with "with multiple, identical and undifferentiated counts [20 counts of child rape and 20 counts of felonious sexual penetration of a minor] violated the constitutional requirements imposed by due process." *Id*. at 629, 636. Recently, in *Perry*, we considered *Valentine* and found it had no binding effect. We also concluded it was distinguishable.

{¶ 15} In *Perry*, the defendant, Mack Perry, had been convicted of one count of rape, eight counts of gross sexual imposition ("GSI"), and five counts of disseminating matter harmful to juveniles in connection with abusing his three daughters. The acts allegedly took place between January 1, 2000, and December 31, 2003, but the indictments were not filed until January 2023, when Perry's daughters were adults. *Perry* at ¶ 1, 4. We reversed the convictions on the five counts of disseminating harmful materials, as the State agreed they were time-barred. *Id*. at ¶ 13-19. However, we found the eight GSI charges were not time-barred. *Id*. at ¶ 20.

{¶ 16} Concerning two of the eight GSI charges, Perry argued that his convictions of two identically-worded charges violated his due process rights. This factual situation is

6

similar to the case before us, which involves two occurrences of sexual conduct.[2] To support his position, Perry relied on *Valentine*. *Perry*, 2025-Ohio-1486, at ¶ 32-34 (2d Dist.). As here, the two GSI counts in *Perry* followed the statutory language of the offense. A bill of particulars was also filed, which added the child's name and the fact that the defendant had directed this victim to touch his penis at a particular address in Dayton, Ohio. *Id*. at ¶ 32. We found Perry's failure to object to the indictment or to the bill of particulars mandated review for only plain error. *Id*. at ¶ 42.

{¶ 17} At trial, the victim in *Perry* testified that "'several incidents' of sexual touching occurred on Fernwood Avenue at 'several locations' in the house, both upstairs and in a basement bathroom. When asked what happened in the basement bathroom, she responded: 'I specifically remember Mack [Perry] pulling out his penis and making me touch his penis in that bathroom.' The prosecutor then asked whether acts of sexual touching that she had described, including being instructed to touch her father's penis, each had happened more than one time on Fernwood Avenue. A.P. responded: 'Absolutely.' In its closing argument, the prosecutor told the jury that count six 'deals with the causing [A.P.] to touch the Defendant's penis.' Regarding count eight, the prosecutor stated that it involved 'causing [A.P.] to touch the Defendant's penis another time.' The jury found Perry guilty on both counts." *Id*. at ¶ 33.

{¶ 18} In considering the due process argument, we extensively discussed *Valentine*, including its later reception by the Sixth Circuit and Ohio state courts, which had either rejected or distinguished *Valentine*. *Perry* at ¶ 34-44. Without reiterating the entirety of our discussion, we noted the Sixth Circuit's concern with the defendant's prosecution of two

---

[2] Although the indictment contained four counts (two of rape and two of sexual battery), the parties agreed the sexual battery convictions merged into the rape convictions. Therefore, only two incidents were at issue.

crimes committed twenty times rather than forty separate criminal acts; the prosecution's failure to lay out in the charges and the evidence the factual bases of those forty incidents; the child's description of "typical abusive behavior" and testimony that the "typical abuse" had occurred fifteen or twenty times; and considering the way the defendant was indicted and tried, the great difficulty the jury would have had in deciding each count on its own. (Cleaned up.) *Id.* at ¶ 36, quoting *Valentine*, 395 F.3d at 632-633.

{¶ 19} In *Valentine*, the Sixth Circuit stressed that "the constitutional error in this case [was] traceable not to the generic language of the individual counts of the indictment but to the fact that there was no differentiation among the counts." *Valentine* at 636. Even before *Perry* was decided, we had interpreted this remark about constitutional error to mean that "*Valentine* does not stand for the proposition that the indictment must contain detailed allegations about the nature of each offense." *State v. Ross*, 2010-Ohio-843, ¶ 143 (2d Dist.). This is consistent with the Sixth Circuit's later explanation of why it doubted that *Valentine* could support federal habeas relief. *See Coles v. Smith*, 577 Fed.Appx. 502, 508 (6th Cir. 2014). In *Perry*, we noted the Sixth Circuit's observation but did not discuss the underlying reasoning in detail. *See Perry*, 2025-Ohio-1486, at ¶ 39 (2d Dist.).

{¶ 20} The Sixth Circuit's observation was based on the difference in the application of the Fifth and Sixth Amendments in federal criminal proceedings as opposed to Ohio criminal proceedings. Specifically, the United States Supreme Court has not extended the Fifth Amendment indictment requirement to the states; instead, it has only applied Sixth Amendment protections to the states through the Fourteenth Amendment. *Coles* at 506 (summarizing applicable Supreme Court precedent). The Sixth Circuit explained that "[i]n federal prosecutions where the Fifth Amendment applies, the Supreme Court has instructed that a grand jury indictment must contain the elements of the offense charged, it must

8

sufficiently apprise the defendant of what he must be prepared to meet, and it must accurately demonstrate to what extent he may plead a former acquittal or conviction to avoid double jeopardy if subsequent proceedings are brought against him for a similar offense." *Id*., citing *Hamling*, 418 U.S. at 117-118, and *Russell v. United States*, 369 U.S. 749, 763-764 (1962).

{¶ 21} A federal indictment, therefore, "must provide more than conclusions of law; it must 'descend to particulars' to inform the defendant of the facts alleged 'with reasonable particularity of time, place, and circumstances.'" *Id*. at 506-507, quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875). Contrasting the rule for federal indictments, the Sixth Circuit has noted that "[b]ecause the Supreme Court has not imposed the Fifth Amendment requirements for federal indictments on state charging instruments, our court has recognized that 'there is no constitutional right in a state prosecution to a grand jury indictment with particular specificity.'" *Id*. at 507, quoting *Williams v. Haviland*, 467 F.3d 527, 534 (6th Cir. 2006).

{¶ 22} The Sixth Circuit also has observed that its analysis in *Valentine* was based on cases involving federal indictments and "a few circuit court cases," two of which were decided before enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Coles*, 577 Fed.Appx. at 507. The AEDPA sets out the standard for granting habeas relief, which may be granted on a claim adjudicated on the merits in state court if adjudication of the claim "'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id*. at 505, quoting 28 U.S.C. 2254(d)(1).

{¶ 23} The other two circuit court cases on which *Valentine* relied were decided prior to a 2010 decision of the United States Supreme Court, which had admonished that "'clearly

9

established Federal law' means relevant Supreme Court precedent and not circuit court opinions." *Id*. at 507, citing *Renico v. Lett*, 559 U.S. 766, 778-779 (2010). The Sixth Circuit has stressed that "'no Supreme Court case has ever found the use of identically worded and factually indistinguishable [state] indictments *unconstitutional*.'" (Bracketed text and emphasis in original.) *Id*. at 507-508, quoting *Valentine*, 395 F.3d at 639 (Gilman, J., dissenting). Consequently, *Valentine* was not supported by relevant Supreme Court precedent.

{¶ 24} In view of the above discussion, an indictment under Ohio law does not violate a defendant's constitutional rights by solely using the language of the applicable criminal statute. That does not mean, of course, that no particularity is needed. As noted in *Sellards*, if accused parties seek more specific information, they may request a bill of particulars. *Sellards*, 17 Ohio St.3d at 170. Nonetheless, this is a statutory or criminal rule requirement; it is not constitutionally mandated.

{¶ 25} *Perry* and other Ohio state cases have found that *Valentine* is not binding and that sufficient differentiation may be made through a bill of particulars, trial testimony, or other means by which details of the charges are revealed. *E.g., Perry*, 2025-Ohio-1486, at ¶ 43 (2d Dist.), *State v. Artz*, 2015-Ohio-5291, ¶ 34-35 (2d Dist.), and *State v. Schwarzman*, 2014-Ohio-2393, ¶ 11 (8th Dist.) (all citing trial testimony). *See also State v. Eal*, 2012-Ohio-1373, ¶ 79-80 (10th Dist.) (defendant received actual notice from discovery, prosecutor's meeting with defense counsel to discuss images that went with counts of the indictment, and suppression hearing that occurred) and *State v. Bryant*, 2021-Ohio-2806, ¶ 19, 23 (9th Dist.) (relying on discovery provided, defendant's withdrawal of his request for bill of particulars, and victim's trial testimony).

{¶ 26} Turning to the case before us, the charges involved Barber's daughter, who was seven years old at the time of the alleged crimes. The indictment specified a limited time period of approximately six weeks, from August 1 through September 20, 2023. At trial, the State presented testimony from the following people: Jane, who lived across the street from Barber; Robert Schneider, a deputy sheriff and detective with the Montgomery County Sheriff's Office; Dr. Micelli, a child abuse expert; Ashley B., a family counselor at CARE House who conducted A.B.'s forensic interview; April D., a nurse practitioner at CARE Clinic; Kayla H., a therapist at the child advocacy center Isaiah's Place; A.B.; and Walter Bender, a detective with the Montgomery County Sheriff's Office. Barber presented testimony from his mother, sister, and niece.[3]

{¶ 27} The alleged abuse came to light based on statements that A.B. made to Jane. When Jane first noticed someone living in the residence across the street, Barber was living there with a girlfriend and four children, including A.B., her brother Tommy, and two younger children. At some point, the girlfriend moved out. Jane first met Barber in September 2022 because her son, John, was playing with A.B. and Tommy, who were a few years younger than John. The children played together in the yard and in Jane's home, and John would go over to Barber's house. Jane and her family (which included John, Jane's ex-husband, and another son who was 19 years old), invited Barber to their home because Barber's children were coming over, and Jane wanted to get to know the children's father. Barber seemed nice and they all became really close. Tr. 120-122, 124-125, 146.

{¶ 28} The children went to school together and rode the bus together. This progressed to the children spending the night together. This began about a week or two after

---

[3] Most witness names are pseudonyms, which are being used to protect the identity of people who are neither medical professionals nor law enforcement officers.

the children started hanging out together and took place especially when Barber would be working. Barber had a job at Frito-Lay, working from around 2:00 a.m. to about 10:00 a.m. At first, Barber's children did not come over to Jane's house at night. They came over to her house in the morning so Jane could take them to the bus stop, or she would have to get them from Barber's house. Tr. 126.

{¶ 29} Barber's children spent nights at Jane's before September 2023. Sometimes this occurred a few times a week or on every other weekend, especially if Barber had to work on the weekend. Jane was aware the children were alone at night when Barber worked. If they were not with her, she constantly looked outside to make sure no one was going into the house; if anyone was outside, she let Barber know immediately. On September 18, 2023, Children Protective Services ("CPS") visited Barber's house and left a note on the door. Someone had called CPS because Barber had been leaving the children alone at night. As a result, Barber asked Jane if she would keep the children while he worked at night. Jane agreed to do so. Barber also told Jane that CPS would call her because Jane was the one the children would be staying with at night. Tr. 126-127, 145, 147-149, 152-153.

{¶ 30} Barber brought the children over to Jane's house that night, September 18, and they stayed over until the next day, a school day. Jane's normal routine when the children spent the night was that they would get dressed, and she would fix them breakfast. The morning of September 19, Jane asked the children what they wanted for breakfast, and they all wanted something different. A.B. wanted pancakes, Tommy wanted oatmeal, and John wanted waffles. The boys also wanted sausages. The kind of sausage Jane always used was Brown 'N Serve links. When Jane took the sausages to the dining table, A.B. looked at her and said "something to [her] about those sausages that" caused Jane to take some further action. The general nature of what was said was that "something not right had

12

happened, and [Jane] needed to go to somebody and let them know." Tr. 131. Jane could hardly believe what she had heard. At that point, she went to John's room to get his clothes ready. A.B. came with her and repeated what she had said before. Jane then followed her normal course of taking the children to the bus stop, where they got on the bus and went to school. Tr. 128-129, 131-132.

{¶ 31} Afterwards, Jane went to work and confided in her boss. They decided she should call the police, and Jane called the Harrison Township police, who told her to come in that day after work. Jane went to the police station at around 4:30 or 5:00 p.m. and told the police what had happened. When Jane arrived home around 5:18 p.m., CPS and the police were at Barber's house. At around 6:54 p.m., Jane texted Barber and asked if the children were coming over to her house. Barber said they were not coming, and Jane asked if things were okay; Barber responded that two things had been reported on him and that his mother was there with the kids to get them to the school bus and do everything in between. He also said he would not be able to have contact with the kids or the house until everything was sorted out. Tr. 133-134, 137, 139, 140, and 151; *see also* State's Exs. 4-6 (text messages).

{¶ 32} Detective Schneider, then a deputy sheriff, interviewed Jane. After talking to her, he called Children Services and went to Barber's house to conduct a law enforcement removal of the children in the home and inform Barber that an investigation had ensued. Ultimately, Barber's mother, Linda, arrived and stayed with the children. Although Schneider did not inform Barber of the nature of the allegations, Children Services told Barber the allegations were of a sexual nature. Tr. 160, 162-164, 166-167, 169-170.

{¶ 33} On September 29, 2023, Ashley B. conducted a forensic interview with A.B. at CARE House. During the interview, A.B. disclosed sexual abuse. As a result, Ashley referred

13

A.B. for mental health services and a CARE Clinic examination. Tr. 216-218. A DVD of A.B.'s interview was played at trial. Tr. 218-219; State's Ex. 30.

{¶ 34} Before trial, the State filed a motion on May 30, 2024, seeking a court ruling on the admissibility of A.B.'s forensic interview. The court scheduled a hearing on the matter for July 22, 2024. Barber did not provide a transcript of the hearing, but it was held, and both sides filed post-hearing memoranda. *See* Defendant's Memorandum (Aug. 12, 2024), and State's Memorandum Regarding Forensic Interview (Aug. 12, 2024). The State's memorandum discussed the interview in detail and mentioned specific instances where A.B. had disclosed details about the timeframe and location of the acts of sexual abuse, as well as the fact that the sexual conduct had happened more than once. State's Memorandum, p. 2-5. The interview itself appears to have lasted more than 70 minutes. *Id*. at 4.

{¶ 35} In its decision, the court noted that defense counsel and Barber were present for the hearing, that the forensic interviewer had testified, and that two exhibits were admitted during the hearing: the DVD of the forensic interview and a Dayton Children's Advocacy referral form. Decision Granting State's Motion for Admission of the Forensic Interview, p. 1. After considering the testimony and the applicable law, the court found that the State should be allowed to admit approximately 11 minutes of the interview because the disclosures made during those segments of the interview would impact the medical treatment and mental health counseling of A.B. *Id*. at 4.

{¶ 36} We reviewed the DVD admitted during trial as State's Ex. 30. It contains three clips. During the first clip, A.B. stated that her father had put his "middle" in her mouth, that it happened more than one time, that it happened in second grade when she started school (which was during the time frame listed in the indictment), and that her father had done it at night sometimes when she was sleeping in his bed. In a second clip, A.B. described how it

14

felt in her mouth, that it went under her tongue and in her cheek, and hurt. She further said that her father "takes" off his pants and underwear and "puts" his middle in her mouth. During these clips, A.B. clarified that when she spoke about her father's "middle," she was referring to his private part.

{¶ 37} At trial, A.B. testified consistently with her forensic interview. At the time of the November 2024 trial, A.B. was eight years old and would turn nine years old the following week. She stated that she was in the second grade the prior year, 2023-2024. Tr. 243-244. A.B. identified her father in the courtroom, identified a picture of his bedroom, and identified a picture of a pink Frito-Lay t-shirt that he had used to cover her eyes, after which he had put his middle in her mouth. She described the "middle" as her father's privates, and said she knew it was his middle because she felt it. She also identified a picture of the pink t-shirt. *Id*. at 249, 255; State's Ex. 27. A.B. stated that this never happened anywhere other than in her father's bedroom. She twice indicated that it had happened more than one time. Tr. 250, 255.

{¶ 38} After A.B. was referred to the CARE Clinic, April D. examined her on October 26, 2023. When April asked A.B. why she was there, A.B. stated that her father had put his middle in her mouth. When asked clarifying questions about what her father's middle was, A.B. pointed to her genitals. A.B. was given a test for gonorrhea and chlamydia, which was negative. Tr. 227, 231-232. As noted, A.B. was also referred for mental health counseling. During the initial intake appointment in March 2024, A.B. disclosed sexual abuse to her therapist, Kayla, where she stated that her father had put his middle in her mouth. Tr. 235-236, 238.

{¶ 39} Detective Bender was the last state witness to testify. He observed A.B.'s September 29 forensic interview from a separate room, after which he obtained a search

warrant for Barber's house. During the search, Bender found the pink Frito-Lay shirt in Barber's dresser. Tr. 262, 264-266.

{¶ 40} When moving for acquittal under Crim.R. 29, Barber's only claim was that although the indictment alleged occurrences between Aug 1 and Sept 20, the State failed to present evidence proving when the alleged incidents took place. The trial court overruled both motions for acquittal. *See* Tr. 273-274, 321-322.

{¶ 41} In light of the preceding discussion, we find *Valentine* inapplicable. Unlike *Valentine*, only two incidents were at issue here, and the victim stated, both during her forensic interview and at trial, that Barber had abused her more than one time. In addition, A.B. also said in her forensic interview that the abuse started in second grade and that Barber did it "sometimes" when she was sleeping in his bed. *See* Ex. 30, clip one. These statements clearly indicate that the abuse occurred more than once, which is all that was necessary to support the State's charges regarding two separate incidents. Barber further lacks any viable objection that he had not been informed of the basis for the indictment. As indicated, the court held a hearing on admissibility of the forensic interview, and Barber and his counsel were aware of the content of the interview disclosing the nature of his conduct. Because no plain error or any error occurred, the first assignment of error lacks merit and is overruled.

### III. Insufficient Evidence

{¶ 42} Barber's second assignment of error states:

INSUFFICIENT EVIDENCE WAS PRESENTED TO SUPPORT CONVICTIONS ON COUNTS III AND IV.

{¶ 43} Under this assignment of error, Barber contends that insufficient evidence existed for his convictions on Counts III and IV, the second set of rape and sexual battery

charges, because the State failed to provide any evidence for these convictions. Barber relies on A.B.'s testimony under direct examination that the conduct occurred more than one time and later statement under cross-examination that she did not know how many times it happened. Appellant's Br., p. 7.

{¶ 44} Before the trial court, Barber's motion for acquittal at the close of the State's case asserted that although the indictment alleged occurrences between August 1, 2023, and September 20, 2023, no evidence was presented proving when the alleged conduct actually occurred. Tr. 273. In responding to the acquittal motion, the State noted that during the portion of the forensic interview that was admitted at trial, A.B. said the abuse happened at the beginning of second grade. *Id*. This is correct. The State also stressed the common knowledge that the school year begins in August. Finally, the State explained that it had narrowed the indictment to the time frame in September 2023 when Barber had access to his daughter. *Id*. None of this has anything to do with Barber's present argument on appeal. As Barber moved for acquittal during trial based on the State's alleged failure to prove when the sexual abuse occurred, we review this issue only for plain error.

{¶ 45} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a

reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 259-160 (1991), paragraph two of the syllabus.

**{¶ 46}** Our review of the evidence, as stated above, reveals that the State presented sufficient evidence to prove the elements of the crimes that were charged. As noted, the indictment follows the statutory language for elements of the crimes of rape and sexual battery. For purposes of both crimes, "sexual conduct" means "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex." R.C. 2907.01(A).

**{¶ 47}** Barber's challenge lies in the inconsistency he perceives between A.B.'s testimony during her direct- and cross-examinations, which goes to her credibility. However, "witness credibility is not a proper matter on review of the sufficiency of the evidence." *State v. Wilks*, 2018-Ohio-1562, ¶ 162, citing *State v. Dean*, 2015-Ohio-4347, ¶ 169. "The credibility of the witnesses and the weight to be given to their testimony is a matter for the trier of facts, the jury here, to resolve." *State v. White*, 2005-Ohio-212, ¶ 65 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). Thus, Barber's argument would be relevant to a manifest weight challenge, which he did not make, but not to an analysis of sufficiency.

**{¶ 48}** After considering the facts and applicable law, we conclude that the jury's verdicts finding Barber guilty of rape and sexual battery were based on sufficient evidence, and there was no error, plain or otherwise. Accordingly, the second assignment of error is overruled.

**IV. Sentencing**

**{¶ 49}** Barber's third assignment of error states:

THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES.

**{¶ 50}** Under this assignment of error, Barber asserts the trial court erred in imposing consecutive sentences because he was young—27 years old at the time of sentencing—and had no prior criminal record. Barber further argues that the State failed to present evidence that the harm caused by his two offenses was so great or unusual that consecutive sentences were warranted.

**{¶ 51}** "Ohio law presumes that a defendant convicted of multiple crimes will serve his sentences concurrently." *State v. Glover*, 2024-Ohio-5195, ¶ 38, citing R.C. 2929.41(A). But trial courts may impose consecutive sentences when a law specifically permits them to do so. *Id.* Under R.C. 2929.14(C)(4), courts may impose consecutive sentences after engaging in a three-step analysis. *Id*. Under this statute, a court first must find consecutive sentences "are necessary to protect the public from future crime to punish the offender." The next step is to find "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." In the final step, the court must find that any one of three circumstances enumerated under R.C. 2929.14(C)(4)(a)-(c) applies. As relevant here, the trial court found that "at least two of the multiple offenses were committed as part of one or more courses of conduct[,] and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct . . . adequately reflects the seriousness of Mr. Barber's conduct." Tr. 381.

19

*See* R.C. 2929.14(C)(4)(b). The court repeated these findings in its final judgment entry sentencing Barber.

{¶ 52} In considering sentences, appellate courts are required to "'review the record, including the findings underlying the sentence or modification given by the sentencing court.'" *State v. Marcum*, 2016-Ohio-1002, ¶ 9, quoting R.C. 2953.08(G)(2). Under this statute,

> "*[t]he appellate court's standard for review is not whether the sentencing court abused its discretion*. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, *whichever, if any, is relevant*; [or]
>
> (b) That the sentence is otherwise contrary to law."

(Emphasis in original.) *Id*., quoting R.C. 2953.08(G)(2).

{¶ 53} "Clear and convincing evidence" means "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 54} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings." *State v. Bonnell*, 2014-Ohio-3177, syllabus. *Accord State v. Thompson*, 2025-Ohio-2168, ¶ 83 (2d Dist.). This standard is deferential, and appellate courts are not

20

permitted to "simply substitute" their judgment for that of trial courts. *State v. Gwynne*, 2023-Ohio-3851, ¶ 15.

{¶ 55} As indicated, the trial court made the findings required to impose consecutive sentences during the sentencing hearing and in the judgment entry. The court did not provide reasons beyond reciting the language in the statute, as it was not required to do so. Notably, during the sentencing hearing, in discussing the purposes and principles of sentencing, the court mentioned the following factors that made the crime more serious: (1) A.B.'s physical or mental injury was exacerbated due to her age, which was only seven or eight at time; and (2) the relationship between Barber and A.B. facilitated the offense as she was his daughter, he was a sole parent, and there was no one else there to help her. Tr. 387-388.

{¶ 56} The possible sentences for a single conviction of rape of a child under 10 years of age are 15 years to life or life without parole. *See* R.C. 2907.02(B) and 2971.03(B)(1)(b). The trial court did not sentence Barber to the maximum prison sentence authorized for his offenses—two consecutive sentences of life without parole. Having reviewed the record, including the trial transcript, exhibits, and presentence investigation report, we cannot clearly and convincingly find that the record fails to support the trial court's sentence, Consequently, the third assignment of error is overruled.

### V. Conclusion

{¶ 57} All of Barber's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J., and HUFFMAN, J., concur.

21